Filed 4/18/25  P. v. Escobar CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PETE ESCOBAR,<br><br>    Defendant and Appellant. | B330195<br><br>(Los Angeles County<br>Super. Ct. No. NA114280) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Chet L. Taylor, Judge.  Affirmed as modified.

Micah Reyner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

Attorney General, Steven D. Matthews and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

Pete Escobar appeals from a judgment of conviction for attempted murder, assault with a deadly weapon, and two counts of possession of a firearm by a felon.  On appeal, Escobar contends his trial attorney rendered ineffective assistance of counsel by failing to object to inadmissible evidence.  He also contends the trial court committed two sentencing errors and the abstract of judgment must be corrected.  We conclude Escobar failed to show his trial counsel's performance was deficient.  We modify the judgment and otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 1, 2020, around 10:00 p.m., Joseph Cigliano was shot in the backyard of a residence in San Pedro.  The police found casings from a .9mm firearm at the scene.  A neighbor's surveillance camera recorded the suspect running on the street next to the residence after the shooting.

When interviewed at the hospital, Cigliano refused to identify the shooter, indicating only that the shooter belonged to the Rancho San Pedro gang.  A police officer familiar with that gang reviewed the surveillance video and identified Escobar as the suspect.

On April 13, 2020, detectives with the Los Angeles Police Department (LAPD) conducted a recorded video interview with Escobar in connection with their investigation of the shooting. They questioned Escobar about a .44 Magnum revolver police found at his residence during a search.  Escobar denied the gun belonged to him and said he did not know where it came from.

The police showed Escobar a still from the neighbor's surveillance video from the night of the shooting. They told Escobar that he had been identified as the person who shot Cigliano. Escobar denied that he was the person in the photo and said he had been home with his children. The detectives told Escobar that they had surveillance footage of him with a gun near the scene. They asked Escobar for his side of the story, including "if [he was] trying to protect [him]self or something like that . . . ." Escobar said he could not help detectives and that he had "no story to tell."

Escobar confirmed that he knew Cigliano. Cigliano had dated Escobar's ex-wife in 2015, while Escobar was incarcerated. Escobar told police he got into an altercation with Cigliano at a domestic violence class the year before. Escobar said Cigliano and his ex-wife had neglected his five children while Escobar was incarcerated. Escobar's daughter told him Cigliano had hit her. He told detectives that he "wanted to kill the guy back then, but [he] didn't[,]" and he no longer felt that way.

The People charged Escobar with willful, deliberate, and premeditated attempted murder (Pen. Code, §§ 664, 187, subd. (a); count 1)[1]; assault with a firearm (§ 245, subd. (a)(2); count 2); and possession of a firearm by a felon (§ 29800, subd. (a)(1); counts 3 & 4). The information alleged firearm enhancements as to count 1 (§§ 12022.5, subd. (a), 12022.53, subds. (b)–(d)) and count 2 (§ 12022.5, subds. (a), (d)).[2] It further

---

[1]    All further undesignated statutory references are to the Penal Code.

[2]    The People added the section 12022.5, subdivision (a) firearm enhancement to count 1 by interlineation during trial.

3

alleged as to counts 1 and 2 that Escobar personally inflicted great bodily injury on Cigliano (§ 12022.7, subd. (a)). The People also alleged that Escobar had suffered a prior strike, had numerous prior convictions of increasing seriousness, and had served a prior prison term. (§§ 667, subd. (d), 1170.12, subd. (b), 1170, subd. (h); Cal. Rules of Court, rule 4.421(b)(2), (3).)

At trial, the prosecution called several witnesses, including neighbors who had called 911 after the shooting and LAPD officers who responded to the scene and conducted the investigation. Neighbors testified to hearing gunshots, but there were no eyewitnesses to the shooting. Cigliano also testified. According to Cigliano, on the night of the shooting, Escobar appeared to be hiding in the yard of the unit where Cigliano lived. Escobar shot him in both legs, unprovoked, when Cigliano stepped outside to go to the store. The prosecution also played a video of Escobar's April 13, 2020 interview with police.

Escobar testified that he shot Cigliano in self-defense. He stated Cigliano had acted violently toward him in the past and, at the time of the shooting, he believed Cigliano wanted to kill him. On April 1, 2020, Escobar went to the San Pedro residence to visit another friend and was not aware Cigliano lived there. When Escobar knocked, Cigliano opened the door, threatened to kill him, and appeared to have a gun. Cigliano began "charging" at him. Escobar backed away and fired a warning shot into the ground in the space between them. When Cigliano did not stop advancing, Escobar fired two or three more shots at the same area, hitting Cigliano in the legs when he ran into the gunfire. He did not tell the detectives that he acted in self-defense because he did not want to be considered a "snitch" for telling police Cigliano came at him with a gun.

4

The jury found Escobar guilty on all counts. It found the attempted murder was willful, deliberate, and premeditated. It also found true the firearm enhancements as to counts 1 and 2 and the great bodily injury allegation as to count 2. The court sentenced Escobar to life imprisonment plus 13 years on count 1, and a consecutive determinate term of four years on count 4. The court imposed and stayed sentences on counts 2 and 3.

Escobar timely appealed.

## DISCUSSION

### I. Ineffective Assistance of Counsel

#### A. Standard of review

The Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution guarantee the right to the assistance of counsel in criminal prosecutions. The "proper standard for attorney performance is that of reasonably effective assistance." (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Pope* (1979) 23 Cal.3d 412, 424 [attorney must provide "reasonably competent assistance"].) An ineffective assistance claim "has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." (*Strickland*, at p. 687.)

"Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's

conduct falls within the wide range of reasonable professional assistance.' [Citation.] Defendant's burden is difficult to carry on direct appeal, as we have observed: ' "Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission." ' [Citation.]" (*People v. Lucas* (1995) 12 Cal.4th 415, 436–437.) "Where the record contains no explanation for the challenged representation, we will reject an ineffective assistance claim unless counsel was asked to explain his performance and failed to provide an explanation, or unless there simply could be no satisfactory explanation." (*People v. King* (2010) 183 Cal.App.4th 1281, 1299; *People v. Ledesma* (1987) 43 Cal.3d 171, 218.)

## B. Evidence regarding Escobar's gang affiliation

Escobar argues his trial counsel rendered ineffective assistance by: (1) failing to object to Officer Malagi Nua's testimony about Escobar's membership in the Rancho San Pedro gang and his moniker "Pistol Pete"; (2) failing to move to exclude portions of the police interview in which Escobar and officers discussed his moniker, "Pistol Pete"; and (3) failing to object to Officer Daniel Rosales's testimony recounting Cigliano's statement that the shooter was a member of " 'the Ranch.' " We conclude Escobar fails to establish his trial counsel's performance was deficient.

### 1. Challenged evidence

Officer Rosales responded to the scene of the shooting on April 1, 2020, and later spoke to Cigliano as part of his investigation. He testified that at the hospital, Cigliano "didn't want to talk with officers, but then . . . he told us he didn't want

6

to snitch and that the shooter was from 'the Ranch,' as in the Rancho San Pedro Street Gang."

Officer Nua is an officer with the Harbor Division. Nua testified that he was shown surveillance video collected during the investigation of Cigliano's shooting. Nua identified Escobar in the video. Nua was familiar with Escobar because Nua had prior contact with him in the late 1990s while Nua was a gang officer. Nua testified that he had been involved in over 100 investigations of the Rancho San Pedro gang—known as "the Ranch"—and had multiple conversations with Escobar during these investigations. Nua knew Escobar to be a member of the gang at that time and formed "the strong opinion" that his gang moniker was "Pistol Pete."

During rebuttal, the prosecution played a recording of Escobar's April 13, 2020 interview with police. The transcript reflects that in the course of the interview, a detective asked Escobar why he was called "Pistol Pete." After initially evading the question, Escobar denied being a current or former gang member several times. In response to the detective's question about whether "Pistol Pete" was "what they used to call [Escobar]," Escobar responded, "Yeah."

2. <u>Discussion</u>

Escobar argues there could be no rational, tactical reason for his trial counsel's failure to challenge the relevance of the aforementioned evidence because there was no allegation that the shooting was gang-related. We disagree.

"A claim of ineffective assistance of counsel based on a trial attorney's failure to make a motion or objection must demonstrate not only the absence of a tactical reason for the omission [citation], but also that the motion or objection would

7

have been meritorious, if the defendant is to bear his burden of demonstrating that it is reasonably probable that absent the omission a determination more favorable to defendant would have resulted." (*People v. Mattson* (1990) 50 Cal.3d 826, 876.) " '[B]ecause trial counsel's tactical decisions are accorded substantial deference [citations], failure to object seldom establishes counsel's incompetence.' [Citation.]" (*People v. Williams* (1997) 16 Cal.4th 153, 215.)

We cannot conclude that no rational, tactical purpose existed for defense counsel's failure to object to evidence and testimony regarding Escobar's gang affiliation. Indeed, the record affirmatively indicates why Escobar's trial counsel elected not to object to Nua's testimony and suggests a tactical reason for his failure to object to the other evidence of gang affiliation Escobar challenges on appeal.

During a colloquy outside the presence of the jury during Escobar's direct examination, defense counsel argued testimony regarding Cigliano's past bad acts should be admitted because the prosecution elicited testimony from Nua regarding Escobar's purported gang involvement. The court noted that counsel had not objected to Nua's testimony about Escobar's gang involvement. Defense counsel responded, "Two things with that. One is, I don't mind if [Nua] was given enough rope to hang himself with. I think that's phenomenal for the defense. Second . . . I've been told by a thousand jurors, objections by the defense are, 'That scumbag is trying to keep evidence from us.' So as a matter of my own strategy, I don't do that."

Whether to object to testimony "is highly tactical, and depends upon counsel's evaluation of the gravity of the problem and whether objection or other responses would serve only to

highlight the undesirable testimony." (*People v. Catlin* (2001) 26 Cal.4th 81, 165.)  Defense counsel here expressly stated that as a strategic matter, he did not object to Nua's testimony because he felt it might discredit Nua and therefore be helpful to Escobar. Counsel also believed an objection would leave jurors with the impression the defense was hiding evidence related to Escobar's gang association.  Counsel therefore made the rational determination that objecting would be more hurtful than helpful to Escobar's case.  The same reasoning could have applied equally to other evidence of Escobar's prior gang affiliation.  (*Ibid.*)

Further, it appears defense counsel made a rational, tactical choice to attempt to undermine the prosecution's case through cross-examination of Nua and Rosales, rather than by objecting during the People's case.  (*People v. Mixon* (1982) 129 Cal.App.3d 118, 138 [counsel's decision to undermine officer identifications through cross-examination instead of objecting to testimony was " 'an informed tactical choice' "].)  Escobar's trial counsel extensively cross-examined Nua regarding the basis for his opinion that Escobar was a gang member.  In part, defense counsel elicited testimony that Escobar never told Nua he was a gang member; the gang unit had never documented Escobar's gang affiliation; Nua did not know if Escobar had been arrested for gang activity or housed as a gang member in custody; and Nua believed Escobar had been a gang member "in the past" but did not know if he was at the time of trial.  In his closing argument, defense counsel referred to the unreliability of Nua's testimony to cast doubt on the integrity of the prosecution's case as a whole.

Similarly, defense counsel used the cross-examination of Rosales about Cigliano's statement that the shooter was from the

9

Ranch gang as an opportunity to discredit Rosales and to emphasize to the jury that Cigliano had a criminal history. Cigliano admitted on cross-examination that he provided a fake name to police because he had an outstanding warrant. Defense counsel subsequently elicited testimony from Rosales raising the possibility that Cigliano declined to cooperate with police to hide his own criminal conduct, and not out of fear of gang retaliation. In closing argument, defense counsel cited this testimony when arguing that the entire case represented an example of "government overreach" and bias. Defense counsel asserted Rosales knew Cigliano lied because of his outstanding warrants, yet Rosales disingenuously tried to make the jurors believe that Cigliano feared gang retaliation. This line of attack would not have been possible had defense counsel successfully objected to Rosales's testimony on direct.

With respect to the police interview, the record permits the reasonable inference that counsel chose not to move to exclude portions of the interview discussing the moniker "Pistol Pete" because they also contained statements favorable to Escobar. During the detectives' line of inquiry into whether people called Escobar "Pistol Pete," Escobar repeatedly denied that he was ever in a gang and insisted the moniker was just an old nickname. These assertions were consistent with Escobar's testimony at trial that he was not, nor had he ever been, a gang member. On this record, we cannot conclude that there could be no satisfactory explanation for counsel's decision not to move to exclude the portions of the police interview referencing the "Pistol Pete" moniker.

Moreover, defense counsel could reasonably question the validity of an objection based on either relevance or undue

prejudice, as the evidence was at least arguably admissible on issues of identity and witness credibility.

Rosales's testimony established that after the shooting, Cigliano identified the shooter only as someone "from 'the Ranch.' " Nua's testimony explained how law enforcement was able to identify Escobar as the shooter. Thus, although it revealed a gang affiliation, evidence establishing that Escobar was the shooter was relevant. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) And, although identity was eventually undisputed, the prosecution had the burden of proving all elements of the charged crimes, including identity, during its case-in-chief. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 400, fn. 4 [" '[T]he prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense.' "].)

Further, " ' "[e]vidence a witness is afraid to testify is relevant to the credibility of that witness and is therefore admissible. (Evid. Code, § 780; [citation].)" ' " (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449.) Defense counsel attempted to impeach Cigliano by noting details he had not disclosed to police about the shooting. Rosales's testimony provided an explanation for Cigliano's initial lack of cooperativeness: he believed Escobar was associated with "the Ranch" and Cigliano was unwilling to "snitch." Nua's testimony that he believed Escobar had been associated with "the Ranch" and was known by the moniker "Pistol Pete" lent credibility to Cigliano's fear of retaliation, as did Escobar's statements in the police interview corroborating his past use of the moniker.

Moreover, the trial court could reasonably have determined the potential prejudicial effect of the evidence of Escobar's gang

11

ties did not substantially outweigh its probative value. (Evid. Code, § 352.) The evidence was limited and did not involve any inflammatory information about the level of Escobar's involvement in the gang or specific gang activity. Escobar's counsel was not deficient in failing to object to evidence that was arguably relevant and admissible. (*People v. Beasley* (2003) 105 Cal.App.4th 1078, 1092, citing *People v. Price* (1991) 1 Cal.4th 324, 387.)

### C.    Detective Halka's testimony

Escobar also contends his trial counsel provided ineffective assistance by failing to object to Detective Gregory Halka's testimony regarding ballistics evidence. Specifically, Escobar argues defense counsel should have objected to Halka's testimony because: (1) it relied on inadmissible hearsay in the form of Cigliano's medical records; and (2) the prosecution had not established Halka's competence to testify to "how a victim's movements would alter the ballistics angle of the shooter's bullet . . . ." We reject Escobar's arguments.

#### 1.    Background

Halka assisted in the investigation of the shooting. He described his "background, training, and experience as it related to guns, firing guns, and investigating shootings[.]" Halka testified: "We are required to attend trainings multiple times throughout the year. I've been a sworn [police] officer for approximately 19 years. I've investigated multiple shooting investigations, including but not limited to homicides, attempted murders, robberies, [assault with a deadly weapon] shootings." On direct examination, Halka testified, among other things, about the location of the shooter in the yard based on where bullet casings were found at the scene.

After Escobar testified, the prosecution recalled Halka in rebuttal. The prosecutor asked Halka if the nature of Cigliano's injuries was consistent with Escobar's version of events. Halka testified that based on his review of Cigliano's injuries as documented in his medical records, it appeared Cigliano was shot by someone facing him. Halka further observed there was "a slight angle" to Cigliano's gunshot wounds, indicating Cigliano was shot while he was standing still. Halka opined that the bullet wounds would "be at a more flat angle" if Cigliano was "charging or turning," but were instead "perpendicular," reflecting that Cigliano had been standing and was "shot from a downward angle." Halka concluded the evidence was inconsistent with Escobar's testimony that Cigliano had been "charging" at him, or that the two had been engaged in any sort of struggle when Cigliano was shot.

### 2. Medical records

During trial, the prosecutor entered Cigliano's medical records into evidence "by stipulation." The records included an affidavit from the custodian of records "attesting they [were] true and correct copies" of Cigliano's treatment for the gunshot wounds to his legs. The court received the records into evidence without objection.

Under the business records exception, a hearsay writing is admissible if it was "made in the regular course of a business," "at or near the time of the act, condition, or event," a custodian "testifies to its identity and the mode of its preparation," and "[t]he sources of information and method and time of preparation were such as to indicate its trustworthiness." (Evid. Code, § 1271.) "Hospital records, if properly authenticated, are admissible under the business records exception to the hearsay

rule." (*People v. Orey* (2021) 63 Cal.App.5th 529, 552 (*Orey*).) Records "produced by the custodian or other qualified witness, together with the affidavit described in [Evidence Code] section 1561," may establish the business records exception without the need for live witness testimony.[3] (*People v. McVey* (2018) 24 Cal.App.5th 405, 414.)

We find no basis to conclude defense counsel's failure to object to Halka's testimony based on Cigliano's medical records as hearsay constituted ineffective assistance of counsel. Escobar does not contend that the affidavit from the custodian of records failed to satisfy the foundational requirements of Evidence Code section 1561. Nor does Escobar argue that Halka's testimony was based on content in the records not subject to the business records exception. (See *Orey*, *supra*, 63 Cal.App.5th at p. 552 [notations on hospital records made by employees with duty to accurately report "provid[ed] an exception to the second level of hearsay" under public records or business records exception].) Counsel therefore reasonably could have decided not to object to Halka's testimony based on the records because they were properly authenticated and fell within an exception to the hearsay rule. (*Shugart v. Regents of University of California* (2011) 199 Cal.App.4th 499, 506 [properly authenticated medical records provide foundation for expert opinion]; see also *Wicks v.*

---

[3]     Evidence Code section 1561, subdivision (a) provides that an affidavit accompanying records must state: (1) the affiant is a custodian or other qualified witness with the authority to certify the records; (2) the documents are true copies of the records requested; (3) the records were prepared in the ordinary course of business at or near the time of the act, condition, or event; (4) the identity of the records; and (5) a description of the mode of preparation of the records.

*Antelope Valley Healthcare Dist.* (2020) 49 Cal.App.5th 866, 876 ["The medical records were properly authenticated as the hospital's business records, and as such, they are not hearsay."].)

           3.      <u>Halka's opinions regarding bullet trajectory</u>

Escobar contends his trial counsel also provided deficient representation by failing to object to Halka's testimony for lack of foundation. He argues Halka was not qualified to testify regarding how Cigliano's physical movements affected the angle of the bullets.

Even assuming defense counsel could have raised a meritorious objection as to the foundation for Halka's testimony, we cannot conclude that there was no satisfactory explanation for counsel's failure to object. As with previous witnesses, Escobar's attorney could have reasonably elected to cross-examine Halka to reveal flaws in the investigative procedure and weaknesses in Halka's conclusions rather than object to Halka's qualifications. The record reflects counsel did so with some success, having elicited from Halka that the police did not use "trajectory rods" during the investigation, which were specifically designed to determine "the angle to which the bullet travels from Point A, the exit of the barrel, to Point B, which is whatever object or thing it strikes." In addition, the record does not establish that, had defense counsel objected, the prosecutor would have been unable to lay additional foundation for Halka's testimony. Defense counsel could reasonably choose to avoid that risk.

In sum, Escobar has not shown that his trial counsel failed to provide reasonably competent representation by not objecting to the challenged testimony and evidence.

## II. Sentencing

Escobar also contends that the trial court made several errors in sentencing. He argues the trial court erroneously applied a prior strike to his sentence without "clearly adjudicating" the prior conviction allegation. Escobar also contends, and the prosecution concedes, that (1) the trial court erroneously sentenced him on a great bodily injury enhancement on count 1 that was not presented to the jury; and (2) the abstract of judgment fails to reflect that the court stayed the sentencing enhancements on count 2. We reject Escobar's argument that the trial court failed to adjudicate his prior strike. We agree with the parties as to the error in the sentence on count 1 and the abstract of judgment, and we modify the judgment accordingly.

### A. Background

In the information, the prosecution alleged that appellant sustained a prior conviction in 2015 that qualified as a strike offense. Before the trial began, Escobar admitted suffering the prior conviction. After the parties submitted the case to the jury, Escobar waived his right to a jury trial on the prior conviction.

At the sentencing hearing, the court began the proceedings by asking, "We're also here for, I guess, a trial on the priors and the [California Rules of Court, rule] 4.421 factor?" The prosecutor agreed and noted that Escobar had previously admitted the prior. The prosecutor submitted "a three-page certified [section] 969(b) packet, and an eight-page certified CLETS." Defense counsel confirmed that he had reviewed the exhibits. The court received the exhibits into evidence and heard argument.

The court then sentenced Escobar on count 1 (attempted murder) to an indeterminate term of life in prison with the

16

possibility of parole, with 14 years to be served before parole eligibility.  The court struck the section 12022.53 firearm enhancement, finding "that the [section] 12022.5(a) enhancement is more than appropriate in this case, in light of the fact that Mr. Escobar has a prior strike."  The court imposed a 10-year prison term on the section 12022.5, subdivision (a) firearm enhancement.  The court then stated, "And then we have the [great bodily injury] on the [section] 12022.7, and that is three years . . . ."  The court ordered the 10-year sentence on the firearm enhancement and the three-year sentence on the great bodily injury enhancement to run consecutive to count 1.

For count 2 (assault with a deadly weapon), the court imposed a sentence of "three years times two, per the three-strikes law for six years, plus you have the [great bodily injury enhancement], three years, and the [section] 12022.5, which would be four years."  The court then stayed the sentence on count 2.  As to count 3, the court selected the midterm of two years, doubled to four years for the prior strike, and stayed the sentence.  For count 4, the court selected the midterm of two years, doubled to four years for the prior strike, and ordered the sentence to run consecutively.  Toward the end of the hearing, the prosecutor asked if "the court actually did make a finding that the alleged prior was true . . . ?"  The court confirmed it had.  The court admitted the People's two exhibits into evidence, without objection.

## B.     Prior strike finding

Escobar contends the trial court erred by failing to adjudicate the prior conviction allegation on the record before imposing a sentence pursuant to the Three Strikes law.  We disagree.

17

When making a finding on a prior strike allegation, trial courts must make " '[r]eference to the prior conviction . . . in the pronouncement of judgment' "; a silent record permits the inference that the trial court made a finding that the prior strike conviction was not true. (*People v. Farias* (2023) 92 Cal.App.5th 619, 635, review granted Sept. 27, 2023, S281027.)

The record here was not silent. Rather, it reflects that the trial court adjudicated Escobar's prior strike. It is undisputed that Escobar admitted the prior conviction before trial. The prosecution introduced his certified prison records and a report of his criminal history. The trial court formally admitted the documents without objection. Escobar's attorney had the opportunity to argue on his behalf. When imposing the sentence, the court made numerous express references to Escobar's prior strike. It struck the section 12022.53 enhancement "in light of the fact that Mr. Escobar has a prior strike." The court doubled his sentence on count 2 "per the three-strikes law." Before reading Escobar his right to appeal, the court clarified in response to the prosecutor's inquiry that it had, in fact, found the alleged prior to be true. The trial court's implied and explicit findings on the record that the prior strike was true were sufficient to adjudicate the allegation. (See *People v. Clair* (1992) 2 Cal.4th 629, 691, fn. 17 [after defendant waived jury trial on prior, court considered certified record of conviction, and the parties presented argument, court "impliedly—but sufficiently" found true a prior conviction allegation by imposing enhancement expressly for the prior]; see also *People v. Williams* (2002) 99 Cal.App.4th 696, 701 [trial court impliedly found felony was serious for purposes of Three Strikes by imposing term of imprisonment under § 667, subd. (a)].)

18

### C. Remaining issues

Both parties agree, as do we, that the trial court erroneously imposed a sentence for a great bodily injury enhancement on count 1 that was not submitted to the jury. Although Escobar contends this court must remand for a full resentencing, he fails to identify the sentencing choices it would be appropriate for the trial court to restructure flowing from the elimination of the great bodily injury enhancement on count 1. (*People v. Francis* (2017) 16 Cal.App.5th 876, 887.) We exercise our authority to modify the sentence on appeal and strike the three-year term imposed for the great bodily injury enhancement as to count 1.

The parties further agree that the abstract of judgment erroneously omits any notation indicating that, as to count 2, the sentences of three years for the great bodily injury allegation and four years for the firearm allegation are stayed. "Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls." (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.) We agree that the abstract of judgment must be corrected to reflect the oral pronouncement of the court.

## DISPOSITION

The judgment is modified as follows: the three-year great bodily injury enhancement (§ 12022.7) on count 1 is stricken. The trial court is directed to prepare a corrected abstract of judgment reflecting the above modification to count 1, and that the three-year great bodily injury enhancement and four-year firearm enhancement on count 2 are stayed. The trial court is directed to forward a copy of the corrected abstract of judgment to the California Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ADAMS, J.

We concur:

EDMON, P. J.

EGERTON, J.

20